LEWIS W. HUDSON, as Administrator, etc., of HARRY L. HUDSON, Deceased, Respondent, *v.* THE ROME, WATERTOWN AND OGDENS-BURG RAILROAD COMPANY, Appellant.

73 467
145a 408
73 467
41ap623

*Railroads* — *death of a fireman, caused by the collapse of a boiler crown sheet* — *negligence as to the condition of the crown sheet* — *inspection* — *evidence.*

However improbable may appear the testimony of a witness who testifies to a fact not in itself impossible in the ordinary course of events, the credibility, force and effect of such testimony is for the jury.

In an action brought against a railroad company to recover damages resulting from the death of a locomotive fireman in its employ, caused by the collapsing of the crown sheet of the boiler of a locomotive while taking in water, the main questions litigated in relation to the defendant's negligence were as to whether or not the crown sheet had been burned prior to the entrance of the deceased upon the locomotive for the trip on which the accident occurred, and as to whether or not the locomotive was properly inspected at the round house before it was sent out. These questions were submitted to the jury and a verdict was rendered for the plaintiff.

*Held,* that the question of the defendant's negligence was properly submitted, in accordance with the rule, that where the question of negligence is presented on conflicting evidence and different inferences may be drawn by the jury from such evidence, the trial court must submit the question to the jury;

And that the verdict was supported by the evidence.

APPEAL by the defendant, the Rome, Watertown and Ogdensburg Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of Jefferson county on the 27th day of May, 1893, upon a verdict rendered at the Jefferson Circuit, and from an order denying the defendant's motion for a new trial made upon the minutes.

The action was brought to recover the damages resulting from the death of the plaintiff's intestate, Harry L. Hudson, alleged to have been caused by the negligence of the defendant.

Harry L. Hudson was a fireman in the employ of the defendant on the 8th day of October, 1890, and was killed at Mexico by the collapse of the crown sheet of the boiler of a locomotive engine, known as No. 103. One George H. Grower was the engineer, and they were ordered on the eighth of October about one-forty-five P. M., to take the engine No. 103 from the round house in the city of Watertown for the purpose of drawing an extra freight train to

the city of Oswego on the defendant's road.  Grower had not run the engine before that time.  When they took possession of the engine there was fire in her, and she had on a pressure of from 140 to 150 pounds of steam.  She was a large engine with four driving wheels on each side.  They took water at the water column in Watertown and left there with the tank full.  They again took water at Pierrepont Manor, and at Richland.  When they reached Mexico the engine stopped at the water column, and Hudson, the deceased, commenced to take water in the tank.  Grower testifies : " She was then getting a third gauge of water; she had then two full gauges and the injector was working at the time; I left the injector going ; I then got down out of the cab and went into the depot to get orders; as soon as I went into the depot I heard this explosion, although there was not much of it to hear ; I ran out of the door and when I came out I saw a cloud of steam, and I went down to the engine ; I saw Hudson, he was back about one car length from the engine ; * * * he was badly burned ; I picked him up and carried him to the station ; he was taken from there to the hospital in Oswego ; I saw him the next morning ; he was still alive, and I saw his remains at the undertaker's rooms at Oswego ; that was the next day, Oct. 9, * * * when I last saw Hudson before the accident he was taking water from the tank ; I examined the engine after the explosion ; I found the crown sheet reversed ; originally it was oval ; there was not a break in the crown sheet ; it was just reversed ; the crown sheet dropped into the fire box, and the stay bolts pulled out; during the time I had charge of the engine on October 8th, 1890, the water did not get so low in the boiler at any time that it did not cover the crown sheet.  From the time I left the Watertown yard until the explosion I had water enough in the boiler to cover the crown sheet all the time.  We reached Mexico about 6.45 P. M. ; when I left the engine to go to the depot at Mexico there was a brakeman on the engine with Hudson ; but I don't remember his name ; it was the duty of the fireman to take water into the tank."

The engine was left in Watertown at the round house where she was coaled and had her fire dumped.  How long she was there is not made very clear by the evidence.  While she was there she was under the control of Batchelder, who is the engine dispatcher and had

charge of the round house at Watertown. Batchelder says: " There was no inspection, except that of the engineer and myself when I was around there; I used to inspect them myself when I was there, and when I was absent the only inspection made was by the engineer; the engineers have orders to inspect their engines and make reports every trip; if the engineer came in with an engine and didn't report anything the matter to me, and I was not around, the engine would not be inspected by any person; I would make an inspection of the engine generally; not necessarily of her boilers; I generally looked around the engine; I have always made it a practice when I would go around an engine to inspect it, to see if there was anything out of order." There was evidence given to the effect that burning or scorching of the steel crown sheet would cause the crown sheet to leak into the fire box around the stay bolts. There was also evidence given tending to show a leakage. Shepard, the hostler at the round house, testifies that he saw engine 103 on the eighth of October, that he cleaned her fires and had her coaled up, and he says, " I don't recollect that it is a fact that I saw her leak before she went out that day; I don't remember as I did; my best recollection to-day is that I did not; I cannot remember as to whether she leaked before or after the accident; I know she did leak; whether it was before or after I don't just remember; I did not see her after the accident until after she came back from the shop; I can't say how long it was, but it was after she had a new crown sheet; I say she either leaked before or after there was a new crown sheet put in her, and I don't remember which; I will not swear that she did not leak before the accident; I don't know how many days I have had her in charge; * * * I have seen her leak quite a number of times; * * * I could not say whether it was before or after the accident; yes, I saw her leak; I looked at her crown sheet, but I can't say whether it was before or after the accident; I didn't discover anything about her being scorched or heated; I didn't say anything to Batchelder about her being scorched or heated; I said nothing except about her leaking; the leaking was in the right hand back corner of the fire box; not under her stay bolts; it is where the crown sheet is connected onto the side sheet; it was caulked up quite a number of times; I think Gates did the caulking at Watertown; I don't know when; Gates is the boiler maker and

he is here in the court room; * * * the leaking was done where the crown sheet connects onto the side sheet; it was on the edge where the crown sheet connects onto the side in the right hand back corner — upper corner."

There was evidence tending to show that a hot fire generating steam of 150 pounds would have a tendency to close any leaks that might have been in her crown sheet, and evidence was also given tending to show that if she leaked only a little it would not be discovered unless someone looked up at the top crown sheet through the furnace door.

*Mullin, Griffin & Walker,* for the appellant.

*John N. Carlisle,* for the respondent.

HARDIN, P. J.:

Upon the trial no serious question was made as to the intestate's freedom from contributory negligence, nor do we understand that question is made in the argument before us. That question was properly submitted to the jury, and we must assume that their verdict finds that the deceased was free from contributory negligence, upon evidence sufficient to establish that fact.

(2) The main question litigated at the trial and pressed upon us in the argument, relates to the defendant's alleged negligence. Plaintiff's position at the trial was that the accident occurred by reason of the collapse of the crown sheet of the engine, and that it had been burned prior to the occasion when the deceased entered upon the engine for the trip when his life was lost. According to the testimony of Grower there were two full gauges, at least, of water in her, and from the time he took charge of her until she collapsed, the crown sheet was covered with water all the time. Shepard, the hostler who had charge of her while she was in the yard at Watertown, testified that he kept water in her boiler while she was there, and from this evidence it is insisted that the crown sheet must have been burned before Shepard took charge of her, and that she was in that burned or defective condition while she was in the yards. There was some evidence tending to show that the top of the crown sheet had a bluish cast on the under side which extended along her length, and could have been discovered upon careful

inspection had for that purpose.   Defendant gave considerable evidence of the condition of the crown sheet after the accident, and the evidence tended to show that an engine with its crown sheet burned to the extent of this one could not be made to run at all, and that one with the crown sheet slightly scorched might be made to work for a short time, and that when the sheet is scorched the soot leaves the fireside of the sheet, and that such was the condition of the sheet just after the accident; and that the scorched area was some thirty-two inches in width at the front of the fire box, and extended the whole length of the sheet, gradually diminishing until at the back end of the sheet the scorched area was only sixteen inches in width.   When the plaintiff rested the defendant moved for a nonsuit, which was denied, and when the evidence was closed the defendant again moved for a nonsuit, and an exception was taken on each occasion, the court holding that the question relating to the defendant's negligence was one of fact for the jury. The defendant contends that the exceptions present error, and that the evidence clearly indicated that the crown sheet was burned at the time of its collapse, and not at a prior time, and that, therefore, the verdict is against the evidence.   We are of the opinion, however, that whether the engine was in a defective condition or not at the time when it was placed in the hands of Grower and the deceased by reason of the fault or negligence of the defendant, was a question of fact which was properly submitted to the jury.   The charge was very elaborate, carefully presenting to the jury the evidence relating to the question of the defendant's negligence; and the judge repeated the question for the jury's determination in several different expressions in commenting upon the evidence.   He said: " But I leave it as I have left it, for the jury to say whether the boiler was in such a condition when it left the Watertown yard as that the failure of the defendant to discover it was negligence; that is, whether, in the exercise of ordinary, reasonable care, they ought to have discovered it."   Again, he says: " I cannot say what the jury would have a right to find the condition of the engine was when it left Watertown.   I simply leave it to the jury to say what its condition was.   It is not for me to say.   When they have determined what its condition was, I leave it to them, as a question of fact, to say whether the defendant, in just the condition

it was in, was guilty of negligence in not having discovered it before it left the Watertown yard; I will say that their duty was to exercise reasonable care in discovering defects, and nothing more; they were not under obligation to make any very extensive inspection of it unless their attention was called to it. They were to use reasonable care in discovering defects, and if, by the exercise of reasonable care they ought to have discovered it, then they were guilty of negligence in not discovering it, and sending it out on the road — in such a condition." We think the rulings and charge of the trial judge were as favorable to the defendant as it was entitled to, and that the verdict is supported by the evidence. (*Buck* v. *Webb*, 58 Hun, 188; *Stevenson* v. *Jewett*, 16 id. 210; *Northern Pacific Railroad Co.* v. *Herbert*, 116 U. S. 642.) It has been repeatedly held that where the question of negligence is presented on conflicting evidence, and where different inferences may be drawn by the jury from such evidence, the trial court must submit the question to the jury. (*Kain* v. *Smith*, 89 N. Y. 376; *Bailey* v. *Rome, Watertown & Ogdensburg Railroad Co.*, 139 id. 302.) In the case just cited the court said: "The evidence of the negligence of the defendant is not direct or positive. But this is an infirmity which attends the investigation of facts in courts of justice in very many cases; * * * we are unwilling to say in this case that there was no evidence from which a just inference might not be drawn by the jury, that the defective condition of the brake existed when the car left Norwood, and that there was a negligent failure to discover it at that point." We think the principle announced in the opinion which we have just quoted is applicable to the facts of the case now presented at bar. Criticism is made by the learned counsel for the appellant in regard to the testimony of Grower on certain essential features of the case. That criticism may be answered by a remark of O'BRIEN, J., in *Hastings* v. *B. L. Ins. Co.* (138 N. Y. 479), which was as follows: "However improbable the testimony of a witness may appear, who testifies to a fact not in itself impossible in the ordinary course of events, the credibility, force and effect of such testimony is for the jury." In the argument submitted to us by the learned counsel for the appellant it is not claimed that any error was committed in the course of the charge or in dealing with the requests, which were numerous,

following the body of the charge. We have discovered no error in the progress of the trial warranting us in overturning the verdict of the jury.

MARTIN and MERWIN, JJ., concurred.

Judgment and order affirmed, with costs.